UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BULLITT UTILITIES, INC. | ) | CASE NO. 15-34000(1)(7) |
| | ) | |
| Debtor(s) | ) | |
| | ) | |
| ROBERT W. KEATS, as the | ) | AP NO. 17-3072 |
| Chapter 7 Trustee | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE BULLITT COUNTY | ) | |
| SANITATION DISTRICT | ) | |
| | ) | |
| Defendant(s) | ) | |

**MEMORANDUM-OPINION**

This matter came before the Court for Trial on the Complaint of Robert W. Keats, Chapter 7 Trustee ("Trustee") for the Bankruptcy Estate of Bullitt Utilities, Inc. ("BU") against The Bullitt County Sanitation District ("BCSD"). The Court considered the testimony of the witnesses and the documentary evidence submitted by the parties. For the following reasons, the Court will enter Judgment in favor of BU.

## **FINDINGS OF FACT**

BU was established in 1976 to provide waste water treatment services to the residents of Hunters Hollow Residential Development in Bullitt County, Kentucky. Carol Cogan was the only shareholder of BU. He was one of the directors along with his wife, Doris Cogan and son, Martin Cogan.

On March 29, 2014, a catastrophic failure of the waste water treatment plant ("WWTP") and sewer collection system owned by BU in and around Hunters Hollow occurred which resulted in over 250,000 gallons of raw and undertreated sewage being discharged into the public waterway.

The BU WWTP served approximately 700 households in and around the Hunters Hollow area. The BU system was completely surrounded by the BCSD. The BCSD provides sewer services to the citizens of Bullitt County, Kentucky. On three or four separate occasions, BCSD and BU had approached each other about BCSD purchasing BU's facility to incorporate it into one system. None of these attempts were successful.

On the date that the BU system failed, it was either insolvent or became insolvent shortly thereafter. At the time of the failure, BU generated approximately $20,000 in revenue from its customers each month, which it used to pay its operating expenses.

Jerry Kennedy, the District Manager of BCSD since 2001, was notified of the failure in the late afternoon of March 29, 2014. He was notified by Emergency Management because they thought the failure had occurred to BCSD's system. Kennedy went to the site shortly after being notified of the failure and determined it was not the BCSD system, but rather BU's system.

A day or two after the failure, Kennedy met with either Carol Cogan or Chris and Marty Cogan, the owners of BU and offered to help solve the problem for $1.5 million. Cogan told him to put it in writing and they would consider it at the next Board meeting, but there was never any agreement reached by the parties on this point.

Rob Moore, an attorney who represented Carol Cogan, the President of BU, learned of the failure on either March 30 or March 31, 2014. He met with Kennedy to discuss how to fix the systems. They spoke in early April. He sent letters to Kennedy in late April about how quickly the failure could be fixed by having BU's system connected to BCSD's system. Mr. Kennedy testified that he stated BCSD would do whatever it could to assist, including connecting the two systems and that BCSD could accept and treat 60,000 gallons per day of the wastewater once the systems were connected.

The parties orally agreed to connect the two systems. BU was going to bring in plastic pipe and discharge the wastewater into a BCSD manhole that connected to the BCSD system. The parties agreed that BU would pay BCSD $14,000 to design and build the pipeline to connect the two systems.

Moore testified that BU completed the work by constructing the pipeline and could have connected the two systems as early as April 7. Kennedy testified that he received a check from BU for $14,000 dated May 30, 2014 and that BCSD cashed the check. Although the work had been completed, Kennedy was advised by BU's attorney not to open the pipeline until negotiations between the parties resulted in a long term contract with BU. Although BU had the capability to accept the flow from BU's system in early April, BCSD did not accept the flow until May of 2015.

Kennedy testified that BU paid BCSD $14,000 for BCSD's work to connect the two systems and for BCSD to begin accepting the flow of wastewater from the Hunters Hollow system immediately. BCSD did accept some amount of flow, but a pump failed and had to be replaced. BCSD had ordered the new pump which was to be delivered in the beginning of May. During this time, BU and BCSD continued discussing a permanent solution. This discussion included BCSD accepting all flow and treating the wastewater or BCSD would build another plant with BU paying for the new WWTP. Once the new pump was received, BCSD could still only accept 60,000 gallons but additional piping was needed to accept the entire 250,000 gallons. By mid-May, it was clear that BCSD would not connect the systems to accept even the 60,000 gallons of wastewater.

Moore testified that it was clear that BCSD was not complying with its oral agreement with BU to accept even the 60,000 gallons, although BCSD had accepted and cashed BU's $14,000 check and had performed the work necessary to connect the two systems.

Pecco Industries was contacted by the Kentucky Division of Water on March 29, 2014, who requested Pecco's assistance with the BU system failure. Pecco went to the scene on March 30, 2014 and was retained by BU on March 31, 2014. They started work on the system on April 1 and began treating wastewater on April 3, 2014.

Pecco constructed a pipeline on April 5 or 6 which connected BU's system with the BCSD manhole. The system could handle 200,000 gallons per day or about 80% of the system's capacity.

Scotty Perdue, the owner of Pecco, indicated that all BCSD had to do was install a pump at the manhole and they could accept the flow. According to Perdue, this could have been done on April 6, 2014. However, BCSD did not do this. Instead, it took another 13 months before BCSD would begin accepting the flow.

Instead, another company, Veollia Water Technologies ("Veollia"), had to be hired to set up another system to temporarily handle the treatment of the wet weather flow and eliminate the bypass of raw sewage into the public stream. If BCSD had accepted the flow of the 60,000 gallons, the Pecco system could have handled the rest of the flow and there would have been no need for Veollia's services.

On November 10, 2014, BU and BCSD entered into a written agreement whereby BCSD agreed "to make any and all reasonable efforts to accept the wastewater flow from" BU within 60 days. BU paid BCSD $125,000 as consideration for this agreement. Despite the terms of the written agreement, Mr. Kennedy testified that he was told by BCSD's attorney not to accept all of the flow until there was a long term contract in place with BU. BCSD determined not to allow the connection without some type of assurance from BU that a new pump station would be constructed. BCSD demanded a deposit of approximately $320,000 into an escrow account or a bond in the same amount before it would accept the flow of wastewater from BU. None of these conditions were part of the November 10, 2014 written agreement.

On February 13, 2015, through an Agreed Order between BCSD and the Kentucky Department of Water, BCSD was required to accept the flow of wastewater within 60 days or it would be fined $100,000. The fine was to be offset by BCSD's acceptance of the flow. Despite the fact that BCSD did not accept the flow from BU by April 13, 2015, BCSD was not fined by the Department of Water.

On May 7, 2015, after Veollia had issued a Termination Notice, the Public Service Commission issued an Order directing BU and BCSD to connect their systems and for BCSD to accept the flow of wastewater from BU. The connection was finally made on May 27, 2015.

On June 4, 2015, Veollia had terminated treatment and began removing of its equipment. Pecco removed its equipment around the same time.

In July 2014, BU had filed an Application for Surcharge with the Public Service Commission ("PSC"). The purpose of the surcharge was to construct new facilities and to have the surcharge in place to recover the cost for the new facility from BU's customers.

On August 24, 2015, the PSC opened an Abandonment Case to look into a request by BU to abandon its facility. On August 31, 2015, the PSC entered an Order finding that BU met the statutory requirements of KRS 278.021 to abandon the facility.

The PSC then filed a Complaint and a Motion to Attach the Assets of BU on September 1, 2015 and a Motion to Appoint BCSD as the Receiver for BU.

On September 23, 2015, BCSD was appointed as the Receiver for BU. As the Receiver, BCSD was entitled to 80% of BU's revenues. Any funds above the 80% could be used to pay BCSD for work performed on behalf of BU, but had to be paid by separate invoice. Any remaining funds above the 80% were to be distributed to BU's creditors.

On December 18, 2015, Veollia and Pecco filed an Involuntary Chapter 7 Petition against BU.

On December 29, 2015, Robert W. Keats was appointed as the Chapter 7 Trustee for BU. Mr. Keats testified that upon his appointment he reviewed the books and records of BU and determined that BU had revenue of approximately $20,000 per month. Although he had been told that the revenues were to be split between BCSD as Receiver and BU on a 80/20 split, in fact there was no split and BCSD controlled 100% of BU's revenue. BCSD, as Receiver, made payments to

a select few creditors of BU who filed claims. Neither Veollia, nor Pecco were paid out of this account. There were also checks written to BCSD out of the account.

On August 21, 2015, a PSC Staff Advisory Opinion was issued regarding fiduciary duties of a receiver of an abandoned the facility. That letter, states in pertinent part:

> (5) Any receiver appointed by the court shall file a bond in an amount fixed by the court. The receiver shall operate the utility to preserve its assets, to restore or maintain a reasonable level of service, and to serve the best interest of its customers.

The Opinion made clear that the Receiver had a duty to act in the best interest of BU. It further states, "the receiver does not, however, become the owner of the assets or the owner of the utility."

Despite the clear terms set forth in the Advisory Opinion of the PSC, Mr. Kennedy testified that his foremost duty as the Receiver was to serve the best interest of the customers of BCSD, not BU or its creditors. He testified he took no action for the benefit of BU, nor did he perceive that he owed any fiduciary duty to BU.

At one point, Mr. Kennedy inquired as to whether the Surcharge Case of BU pending before the PSC, if granted, would be used for the construction of a new wastewater facility. Once Mr. Kennedy learned that the surcharge, if approved, could not be used for system improvements which would be of assistance to BCSD, he withdrew BU's Surcharge Application before the PSC issued its ruling because it would provide no benefit to BCSD. Mr. Keats testified that the surcharge case was the best method for BU's creditors, such as Veollia and Pecco, to be paid.

Kennedy used funds out of the BU account to pay certain creditors of BU, such as M.L. Johnson Company. M.L. Johnson Company sought payment for the cost of certain flow meters that it provided to BU. Kennedy paid M.L. Johnson's invoices collectively amounting to $4,500; but BCSD ended up moving the flow meters for its own use in different locations.

BCSD had to hire outside counsel, Kaplan & Partners, to defend the claims made against it by the Chapter 7 Trustee. Kennedy paid Kaplan's invoices out of the Hunter Hollow account. BCSD wrote checks to Kaplan in the amount of $36, 228.23, then wrote itself a check in the same amount from the Receiver's account. In Kennedy's opinion, since this expense was caused by BU, BU should pay for the legal fees incurred by BCSD.

Trustee Keats testified that upon his appointment, he saw his job as administering any assets of BU and determining if there were any causes of action. He reviewed the Claims Register and had to prepare the Schedules and reviewed the assets and liabilities of the company. Based on his review of BU's books and records, it was clear to him that the company's solvency was questionable up until the time of the failure of the WWTP and the indebtedness of the company was enormous after the failure and BU has been insolvent since that time.

Keats reviewed the invoices and claims of Veollia and Pecco. After his investigation, he determined the services invoiced had been provided to the Debtor and he did not object to their claim. Pecco's Proof of Claim was for $582,290 and Veollia's Proof of Claim was for $2,166,418.

Keats testified that his review of the records established that this Adversary Proceeding, another Adversary Proceeding against the officers and directors of BU and the surcharge case pending before the PSC, were the main assets of the Debtor. He believed the surcharge case was the best way for some of the creditors of BU to get paid. BCSD did not cooperate with him when he tried to get the surcharge case reinstated after BCSD moved to have it dismissed.

BCSD claims it was appointed as Receiver under Chapter 271 of the Kentucky Revised Statutes, but in the abandonment action before the PSC, the PSC referred to BU's duties as a Receiver as set forth under KRS 278.021.

On December 1, 2017, Keats as the Chapter 7 Trustee of BU instituted this Adversary Proceeding against BCSD for (1) breach of oral contract; (2) breach of the November 10, 2014 written agreement; (3) breach of implied covenant of good faith and fair dealing by BCSD; (4) breach of fiduciary duty by BCSD; (5) fraudulent transfers under 11 U.S.C. § 548(a)(1)(A); (6) fraudulent transfers under 11 U.S.C. § 548(a)(1)(6); (7) fraudulent transfers to BCSD under KRS 378.005, *et seq.*; (8) preferential payments to BCSD under 11 U.S.C. § 547; (9) avoidance of unauthorized post-petition transfers under 11 U.S.C. 549; and (10) recovery of avoided transfers under 11 U.S.C. § 550.

## **LEGAL ANALYSIS**

The Court will consider each Count of BCSD's Complaint, as well as the defenses raised by BCSD based upon the Court's factual findings.

A. <u>Breach of Oral Contract</u>.

Count I of the Complaint is for breach of an oral contract. BU contends that in April 2014, BCSD reached an oral agreement with BU whereby BCSD would accept the flow of wastewater and build the necessary pipeline to connect the two septic systems in exchange for BU's payment of $14,000.

This Court previously held in its Memorandum-Opinion denying BCSD's Motion for Partial Summary Judgment on September 27, 2018 that parole evidence is admissible to establish a parole agreement that is not inconsistent with the written agreement. *Bullock v. Young*, 252 Ky. 640, 67 S.W.2d 941 (1933). BCSD's own witness, Jerry Kennedy, testified that following the failure at the Hunters Hollow WWTP, he met with representatives of BU to help solve the problem. He testified that BU paid BCSD $14,000 to design and build a pipeline to connect the BU system with BCSD.

BCSD cashed the check, then designed and built the pipeline in late April, but refused to open the pipeline until a long term contract was reached with BU.  BCSD could have begun accepting the flow of wastewater within a day or two of the agreement, but did not do so until May 2015.

In *Veluzat v. Janes*, 462 S.W.2d 194 (Ky. 1970), the court discussed the elements of an enforceable oral contract.  There must be an element of definiteness as to what services are to be rendered, when they are to begin and how long they were to last, as well as what was promised in return.  "It must be clear and certain that there was in fact an agreement, positively definite and mutually understood."  *Id.* at 197, quoting *Finn v. Finn's Adm'r*, 244 S.W.2d 435 (Ky. 1951).

The evidence at trial established all elements of an enforceable oral contract were met.  There was a definite offer to perform the work to connect the two systems, acceptance of that offer by BCSD, consideration in the form of $14,000 payment by BU to BCSD, partial performance by BCSD, as it did construct the pipeline, and breach by BCSD by failing to accept the flow of the wastewater.

BCSD's defenses to this breach are unavailing.  First, BCSD contends that the parole agreement was inconsistent with the written Agreement executed by the parties in November 2014.  However, there is nothing in the agreement reached between the parties in April 2014 that was inconsistent with the terms of the later November 2014 written Agreement.

The evidence was clear that BCSD completed the necessary pipeline so it could have accepted the flow of wastewater from BU as early as April 2014.  Its refusal to do so, thereby breaching the oral agreement, was nothing more than a power play to demand a long term agreement or contract with BU so that it could take over the entire BU system and incorporate it into its own.  The trial evidence supports the finding that BCSD breached the oral agreement with BU in April

2014.  By failing to accept the flow, BU was required to hire and use the services of Pecco and Veollia.  Had BCSD complied with its agreement to accept the flow, Veollia's services would not have been needed at all.  Therefore, the costs of their services are a direct result of BCSD's breach of its agreement.

      B.  <u>Breach of the November 10, 2014 Written Agreement</u>.

In Count II of the Complaint, BU alleges that BCSD breached the terms of the November 10, 2014 written Agreement.  Pursuant to the terms of the agreement with BU, BCSD agreed to accept and treat the wastewater generated by the Hunters Hollow collection system, which since the date of the failure was being treated by a temporary WWTP provided by Pecco and Veollia (referred to as the "Collection System" in the written agreement).  Specifically, the Agreement provided, in pertinent part:

> 1)  BCSD agrees to make any and all reasonable efforts to accept the wastewater flow from the Collection System within sixty (60) days of the execution of this Agreement . . . . .
>
> 2) BCSD agrees to provide treatment for the wastewater generated by the Collection System until December 31, 2016.
> . . . . .
>
> 4) BCSD shall make every reasonable attempt to accept from the Collection System an average daily flow of 160,000 gallons with the maximum peak daily flow of up to 300,000 gallons. . . . .

In consideration of the obligations undertaken by BCSD in the Agreement, BU paid BCSD $125,000.

Despite accepting the $125,000 from BU, BCSD did not accept any of the flow during the term of the Agreement.  Mr. Kennedy testified that he was instructed by BCSD's attorney to not accept the flow until there was a long term agreement with BU in place and that there was some type

of assurance by BU that they would build the necessary facilities. BCSD would not connect the two systems without monetary assurance from BU that a new pump station would be constructed in the form of $320,000 in an escrow account or a bond in that amount. Mr. Kennedy acknowledged at trial that these conditions were not part of the November 10, 2014 Agreement. He also acknowledged that BCSD could have accepted the flow at the time of the written Agreement, but they would not do so and continued to make demands upon BU that were not in the written Agreement.

It was clear from the testimony of Mr. Kennedy and Mr. Moore, that BCSD breached the terms of the written Agreement by not accepting the flow during the time set forth in the Agreement. The evidence was also clear that BCSD had the capability to accept the flow as early as April 2014 and certainly had that ability at the time of the November 2014 Agreement. Instead, BCSD used its position to make additional demands on BU knowing what a precarious position BU was in. BCSD breached the terms of the written Agreement by continuing to impose additional conditions on BU, all in an effort to secure a long term agreement from BU. The resulting damages, *i.e.*, the continued costs of using Veollia and Pecco's services, are a direct result of BCSD's breach of the November 14, 2014 Agreement.

C. Breach of an Implied Covenant of Good Faith and Fair Dealing by the BCSD.

Implicit in every contract is an implied covenant of good faith and fair dealing. *Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 445 (6th Cir. 2014). The actions of BCSD as outlined in the breach of contract claims established that BCSD breached this duty as well.

It is also clear that by dismissing the Surcharge Application of BU, pending before the PSC, BCSD breached this duty owed to BU's bankruptcy estate and its creditors. The surcharge action

was the best chance for providing a guaranteed method by which creditors such as Pecco and Veollia could be paid. BCSD's action in this regard constitutes a breach of the implied covenant of good faith and fair dealing resulting in the damages caused by the continued services of Veollia and Pecco.

    D. <u>Breach of Fiduciary Duty by BCSD</u>.

On September 23, 2015, upon the Motion of the Public Service Commission of Kentucky, the Franklin Circuit Court issued an Order appointing BCSD as the Receiver for BU. The Order appointing BCSD states:

> BCSD is appointed receiver to take charge, preserve, operate, control, manage, maintain and care for Bullitt Utilities' sewage collection and treatment facilities; to collect all receivables and profits and to exercise generally the powers conferred by this Court and such other powers as are usual and incidental to the management of a public utility providing sewage collection and treatment service to the public.

As the Receiver, BCSD owed a fiduciary duty to BU. KRS 278.021(5), specifically states:

> (5) Any receiver appointed by the court shall file a bond in an amount fixed by the court. The receiver shall operate the utility to preserve its assets, to restore or maintain a reasonable level of service and to serve the best interest of its customers.

In 2015, the former counsel for BCSD requested an Opinion from the PSC to determine BCSD's duties and obligations as the Receiver for BU. The PSC issued its Opinion, PSC Staff Opinion 2015-011, on August 21, 2015 in which it stated that the Receiver, "is a fiduciary in possession of the assets of another party" and has a duty to act in the best interest of BU.

Despite receiving this Opinion on its duties as Receiver, Mr. Kennedy repeatedly testified that his duty was to the customers of the Bullitt County Sanitation District. He acknowledged that he took no actions for the benefit of BU because he did not believe he had to act in the best interest of BU or its customers.

BCSD's attorney informed the BCSD in writing in a letter dated September 29, 2015, that upon opening an account whereby BCSD would act as Receiver for BU, and that there would be an 80/20 split regarding those funds with 80% being the property of BCSD and any remaining funds above the 80% would be available for distribution to BU's creditors. *See*, Plaintiff's Exhibit 9. In practice, however, based on Kennedy's testimony, there was never an 80/20 split and Kennedy used the funds as if they were the sole property of BCSD. Kennedy used the funds in the Receiver account to pay for flow meters from M.L. Johnson Company in the amount of $4,500. The meters were to be used to monitor the flow for the Hunters Hollow system. BCSD, however, moved the meters to other locations and used them as their own. Kennedy testified that the only money that went into this account was the funds paid by the Hunters Hollow customers.

When the Trustee for BU made claims against BCSD, Kennedy used the funds in the Receiver's account to pay the legal fees for the law firm hired by BCSD to defend against the Trustee's claims in the amount of $36,228.23. It was Kennedy's position that since BU had caused BCSD to incur these legal fees, BU should pay the bill.

Although BCSD, as the Receiver, had a duty to act in the best interest of BU, it was clear that Mr. Kennedy did not comply with this duty. In the most egregious example of this, BCSD as the Receiver for BU, decided to withdraw BU's Surcharge Application pending before the PSC after it determined that the surcharge, if granted, would not be used to upgrade BU's infiltration and in flow system. Since it would be of no use to BCSD, it withdrew the Application. However, a surcharge was the best chance for BU's creditors, such as Veollia and Pecco, to have its claims paid. These actions were a clear breach of the Receiver's fiduciary duties to BU.

E. <u>Claims For Fraudulent Transfers and Preferential Transfers</u>.

Counts V, VI and VII of the Complaint include claims asserted for fraudulent transfers under 11 U.S.C. § 544(b)(1) and KRS 378A.040, and 11 U.S.C. § 548. The Court will consider BU's claim under 11 U.S.C. § 548 first. Under this Section of the Bankruptcy Code, the Trustee may recover as a fraudulent transfer, any transfer made by a debtor within two years of the petition date, if the debtor:

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity . . .; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

The evidence establishes that the Trustee proved its claim under 11 U.S.C. § 548(B)(i) and (ii)(1). It is obvious, based on the trial testimony that within two years of the Petition date, BU received little or no value in exchange for (1) its transfer of $14,000 in consideration of the oral agreement with BCSD, where BCSD did not connect the two systems to accept the flow from BU's Hunters Hollow's facility, even though it had built the necessary system and could have accepted the flow; and (2) its transfer of $125,000 to BCSD under the terms of the November 10, 2014 written Agreement where BCSD failed to perform its obligations under the written contract.

The testimony also established that the Debtor was insolvent on the date of these transfers or became insolvent as a result of such transfers or obligations as required by 11 U.S.C. § 548(B)(ii)(1). The Trustee testified that after reviewing the books and records of the Debtor, it was evident that the Debtor was insolvent at the time of the catastrophic failure of the WWTP. Furthermore, the Proofs of Claim filed in the case, which the Court may take judicial notice of,

establish there are millions of dollars worth of general unsecured claims against BU. *See*, *In re Blum*, 255 B.R. 9, n. 5 (Bankr. S.D. Ohio 2000) (allowing judicial notice of Proof of Claim, pursuant to Fed. R. Civ. Evid. 201, where no objection was filed). Furthermore, no evidence was presented by BCSD to refute the evidence of BU's insolvency.

Finally, the Court finds that BU proved its claim for unauthorized post-petition transfers under 11 U.S.C. § 549. This Section of the Code allows the Trustee to avoid a transfer of property of the Estate (1) that occurs after the commencement of the case; and (2) that is not authorized under this Title or by the Court. 11 U.S.C. § 549(a)(1) and (2)(B).

As the Receiver, BCSD was in charge of BU's accounts and income stream. The trial testimony set forth the 80/20 split concerning the income placed into the account from BU's rate payers and the payments to be used for maintaining this system. However, there were unauthorized transfers out of the account by BU such as the $36,228.23 paid to BCSD's legal counsel, out of BU's account. These funds must be repaid to the Debtor from BCSD pursuant to 11 U.S.C. § 550.

    F. <u>Damages</u>.

BU is entitled to damages from BCSD under each of the above enumerated claims. Under the Counts I and II of the Complaint, BU is entitled to recover all damages flowing from BCSD's breach of the oral agreement and the written Agreement of November 10, 2014. Damages for breach of contract are normally that sum which would put an injured party into the same position it would have been in had the contract been performed. *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky. 1995). Here, general damages for breach of contract are those that may fairly and reasonably be considered as arising naturally from the breach or such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach.

*University of Louisville v. RAM Engineering & Const., Inc.*, 199 S.W.3d 746 (Ky. App. 2005), citing *United States Bond & Mortgage Corp. v. Berry*, 249 Ky. 610, 61 S.W.2d 293, 297 (1933).

The evidence at trial demonstrated that as a direct result of BU failing to connect its system with BU's system, as it agreed to do, BU sustained damages amounting to the cost it incurred from having to use the services of Veollia and Pecco. These damages equal the amount of each company's Proof of Claim in this bankruptcy case. Thus, BU is entitled to Judgment under Counts I and II of the Complaint of $582,290 for payment of Pecco's claim and $2,166,418 for payment of Veollia's claim.

Next, all damages flowing from BCSD's breach of implied covenant of good faith and fair dealing. The Court finds that this breach by BCSD resulted in the damages referenced in the breach of the oral and written contracts. The Court will not award separate damages for this breach.

BU is entitled to recover damages for BCSD's breach of its fiduciary duties as the Receiver for BU. The evidence establishing this cause of action included the dismissal of the Surcharge Case which is covered by the damages awarded for the breach of contract. However, there was also evidence of BCSD's use of BU's funds, such as the flow meters purchased from M.L. Johnson collectively in the amount of $4,500 which BCSD used for its own uses, as well as the payments to the Kaplan law firm, amounting to $36,228.23. BCSD must also repay these amounts under the Court's analysis regarding unauthorized post-petition transactions and preferences under Counts V, VI and VII. The evidence at trial supports these awards.

## **CONCLUSION**

For all the above reasons, the Court will enter the attached Judgment in favor of BU against BCSD on its Complaint.

*[signature]*
Joan A. Lloyd
United States Bankruptcy Judge
Dated: April 30, 2019

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BULLITT UTILITIES, INC. | ) | CASE NO. 15-34000(1)(7) |
| | )89 | |
| Debtor(s) | ) | |
| | ) | |
| ROBERT W. KEATS, as the Chapter 7 Trustee | ) | AP NO. 17-3072 |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE BULLITT COUNTY SANITATION DISTRICT | ) | |
| | ) | |
| Defendant(s) | ) | |

## JUDGMENT

Pursuant to the Memorandum-Opinion entered this date and incorporated herein by reference,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that BU is entitled to Judgment in its favor and against BCSD on all counts of its Complaint herein.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that BU is entitled to Judgment against BCSD under Counts I, II, III, V, VI and VII of the Complaint in the amount of $582,290 for the claim of Pecco and $2,166,418 for the claim of Veollia; BU is entitled to Judgment from BCSD under Count IV for the cost of M.L. Johnson's invoices for flow meters collectively amounting to $4,500 and $36,228.23 for payment of BCSD's legal fees.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: April 30, 2019